**In re Kenneth Bruce MIDDLETON and Lynda Anne Middleton, Debtors.**

**Kenneth Bruce MIDDLETON and Lynda Anne Middleton, Plaintiffs,**

v.

**FARMERS STATE BANK OF FOSSTON, Defendant.**

**Bankruptcy No. 3–83–00505. Adv. No. 83–7218.**

United States Bankruptcy Court, D. Minnesota, Sixth Division.

Dec. 19, 1983.

exempt (with the exception of the Disc and Cultivator) is as follows:

| | |
|---|---|
| Hillsboro Gooseneck Trailer | $1,500 |
| Leyland Tractor | 2,000 |
| Melroe Drill | 800 |
| Brillion Seeder | 1,000 |
| John Deere Plow | 50 |
| Melroe Drag | 300 |
| John Deere Flight Conveyor | 500 |
| I.H. Mower-Conditioner | 900 |
| John Deere Rake | 1,200 |
| John Deere Bale Wagon | 50 |
| 2 Bale Mowers | 200 |
| Misc. Livestock Equipment | 1,500 |
| | $10,000 |

In claiming the foregoing items as exempt, the Debtors invoke section 522(d)(5) and section 522(d)(6) which state:

"(d) The following property may be exempted under subsection (b)(1) of this section:

(5) The debtor's aggregate interest, not to exceed in value $400 plus any unused amount of the exemption provided under paragraph (1) of this subsection, in any property.

(6) The debtor's aggregate interest, not to exceed $750 in value, in any implements, professional books, or tools, of the trade of the debtor or the trade of a dependent of the debtor."

Farmers State Bank of Fosston's (BANK) challenge to these exemptions is four-fold. It contends that it has a valid purchase money security interest in the subject property which cannot be avoided under section 522(f). It contends that the subject property is not included in the definition of "implements, professional books, or tools, of the trade". It contends that the Debtors may not increase the amount of the lien to be avoided by reliance upon sections 522(d)(5) and (6) but, rather, must be limited to the particular categories set out in section 522(d) which are identical to those set forth in section 522(f). Finally, the Bank argues that section 522(f) cannot be applied retroactively to its lien which was perfected prior to November 6, 1978, the enactual date of the Bankruptcy Reform Act.

The matter came on for trial before the Court on November 11, 1983. The follow-

John Winters, Crookston, Minn., for plaintiffs.

Edwin Odland, Crookston, Minn., for defendant.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The Debtors, on May 24, 1983, commenced an action to avoid an alleged non-possessory, non-purchase money security interest in certain items alleged to constitute "implements or tools of the trade". The property as to which the Debtors seek to avoid the Defendant's security interest are those items listed in Schedule B–2(i) (with the exception of a John Deere Disc and John Deere Field Cultivator) filed with their voluntary petition on April 5, 1983. The list of equipment and value claimed as

ing summary constitutes the Court's findings of fact:

## FINDINGS OF FACT

Middleton and his wife moved to Fosston, Minnesota, in 1974 and commenced farming at that time. Concurrent with beginning farming, the Debtors started doing business with the Bank. Over the years, the Bank loaned the Debtors various sums and from 1974 through November 1982 had been involved in some 40 loan transactions with them. In 1978 the Debtors lowest outstanding indebtedness with the Bank was $25,000, and it continued to increase. At the time the petition was filed, this indebtedness stood at $69,000. In 1977, the Debtors extended to the Bank a security interest in "all livestock and farm machinery now owned or hereafter acquired". This security interest was first perfected on October 26, 1977, and continued on May 20, 1982. There is no evidence establishing how much money was loaned to the Debtors in 1977 when the security interest was first taken, nor is there any evidence of precisely what the Debtors did with the proceeds. This is also true of the numerous individual loans which followed through November of 1982. The only testimony on this point was from the Bank's cashier who felt that because Middleton was not engaged in farming prior to 1974 he must have purchased all his farming equipment with proceeds from the various bank loans. The two promissory notes received into evidence do not clarify this point. On August 20, 1982, the Debtors gave the Bank a promissory note in the principal sum of $72,425.16 and on its face stated the purpose to be "farm operating expenses". At trial, the bank cashier said he assumed this note was a combination or renewal of various earlier notes. The note itself does not indicate that it is a renewal. The last promissory note given was sometime in November 1982 for the sum of $68,377.74. This note also bears the notation, "farm operating expense". With respect to this note, the bank's cashier said it was a combination of several past due notes, but he was not sure whether at the time the Debtors also received a cash ad-

vance. The latter note does bear the notation that it is a renewal of the August 20, 1982, note. Both notes indicate they are secured.

The cashier stated that over the years the Debtors did make substantial cash payments to the Bank, but he was unable to determine whether these payments occurred by reason of various note renewals or actual cash payments.

The equipment listed on Schedule B–2(i) was acquired by the Debtors between 1973 and 1978.

It was agreed between the parties that this property would be sold at auction with the proceeds being held in escrow by the Bank until resolution of the instant adversary case. An auction was held on June 4, 1983, and the equipment in question was sold along with other items of personal property. The total amount realized from the sale of the equipment listed on Schedule B–2(i) (with the exception of the Disc and Cultivator) was $10,938.00. The other items of personal property brought another $8,136.50. The expense of conducting the auction was $1,609.54.

## CONCLUSIONS OF LAW

### 1.

■ The Bank argues it has a continuing purchase money security interest in the various B–2(i) scheduled items by virtue of the fact that all of this equipment was acquired during the time period in which the Bank was making loans to the Debtors and that prior to doing business with the Bank the Debtors had no farming equipment.

A purchase money security interest under section 9–107 of the Uniform Commercial Code (M.S.A. 336.9–107) is a security interest taken by an entity who, by making advances, gives value to the debtor to acquire rights in the collateral, if in fact such value is so used. Courts have stated as a general proposition that a refinancing arrangement alone extinguishes the purchase money character of the security interest. *Rosen v. Associates Financial Services Co.,*

17 B.R. 436 (D.C.S.C.1982); *Matter of Luc-zak,* 16 B.R. 743 (Bkrtcy.W.D.Wis.1982). The reason often put forth for this position is the near impossibility of determining to what extent each item of collateral secures its purchase money and also the problem in attempting to apportion subsequent payments among the various items of collateral. It has been argued that an exception should exist when the facts are such that it is easy to distinguish between the original purchase money loan and subsequent refinancing advances. See: *In re Slay,* 8 B.R. 355 (Bkrtcy.E.D.Tenn.1980) and *In re Conn,* 16 B.R. 454 (Bkrtcy.W.D.Ky.1982). The court in *In re Conn* read 9–107 as not requiring that purchase money status be denied in its entirety just because an item may secure its own price as well as antecedent debts or future advances. The court goes on to suggest that if a secured debt is capable of being apportioned between purchase money and later advances, then purchase money status should be preserved to the extent of the unpaid purchase price. This Court would be inclined to follow the minority position; however, even if it were to do so, it is our opinion that apportionment is impossible in the instant case. From the evidence, it is unclear whether all the items of equipment were in fact purchased with bank loan proceeds. Some may have been paid for directly from farm income. Furthermore, there are in evidence no originating notes as to any of these items. The notes that were introduced state their purpose to be farm operating expense. From this notation the Court cannot, with any degree of certainty, conclude that the purpose was to purchase specific items of equipment. Also defeating the Bank's purchase-money interest claim is the fact that the August 20, 1982, note does not reflect anywhere on its face that it is a renewal of any prior obligation. Although the Bank's cashier stated it to be a consolidation, he also inferred that the Debtors may have received, as well, a cash advance of an unknown amount.

Therefore, it is the opinion of the Court that the security interest held in the subject collateral is a non-purchase money security interest avoidable insofar as those items come within the purview of section 522(f).

2.

 Relying upon section 522(f)(2)(B), the Debtors argue that the farm equipment listed in Schedule B–2(i) is included in the definition of "implements" and "tools of the trade". If so, and because the Bank's security is a non-purchase money interest, then the Bank's lien in such equipment may be avoided. This is the central issue in this case, and its resolution will be dispositive.

Courts which have construed the meaning of "implements" and "tools of the trade" within the context of section 522(f)(2)(B) have generally held that the definition of "implements" and "tools of the trade" does not include farm machinery or implements. These courts have gone back to the legislative history and determined that congressional intent at the passage of section 522(f) was to protect property of a nominal commercial value but which could be used by a creditor to coerce payment. *In re Sweeney,* 7 B.R. 814 (Bkrtcy.E.D.Wis.1980). There is nothing in the legislative history of the statute nor subsequent case law which indicates that Congress intended § 522(f)(2)(B) to allow the avoidance of large items of farm equipment. See: *In re Metzig,* 33 B.R. 620, 11 B.C.D. 77 (Bkrtcy.N.D.Tex. 1983); *In re O'Neil,* 20 B.R. 13 (Bkrtcy.E.D. Mo.1982); *In re Yparrea,* 16 B.R. 33 (Bkrtcy.D.N.M.1981). The Debtors placed reliance upon *In re Liming,* 22 B.R. 740 (Bkrtcy.W.D.Okl.1982) which considered a tractor to be an implement and within the meaning of section 522(f)(2)(B). We consider *Liming* to be contrary to the great weight of authority and also note that in that case the debtor had premised his exemption claim upon an Oklahoma Statute which allowed an exemption in "all implements of husbandry used upon the homestead", a provision which had been construed by the Oklahoma Supreme Court to include tractors.

From the record, it appears that the Bank, over a number of years, extended the Debtors substantial farm operating loans

against which it took security in various farm property, including those enumerated in Schedule B–2(i). This Court agrees with the rationale of *Yparrea* in the statement that section 522 was never meant to be applied so as to effectively shut off farmers and ranchers from necessary operating loans. This would be the eventual result if the terms "equipment" and "tools of the trade" were construed to include large items of farm equipment. We follow the majority of decisions and hold that the terms were meant to include small tools and implements which have little, if any, resale value. It is the opinion of this Court that none of the enumerated items in Schedule B–2(i) constitute "implements" or "tools of the trade".

### 3.

■ This Court holds that the "wild card" or "spillover" provisions of sections 522(d)(1) and (5) are unlimited and may be applied to any property of the debtor including whatever property constitutes tools and implements of trade under section 522(f). *Metzig,* supra; *In re Brock,* 10 B.R. 67 (Bkrtcy.W.D.Mich.1981); 3 Br.L.Ed. § 22:34.

The constitutional issue raised in the Bank's brief will not be addressed since it is not necessary to a resolution of the instant case.

The auction of the Schedule B–2(i) equipment was conducted with the stipulated understanding that the proceeds would stand in place of the property. The Bank's lien in and to the Schedule B–2(i) equipment is non-dischargeable for the reasons set forth herein and, therefore, the Bank is entitled to the proceeds which total $10,938.00.

The auction expenses should be pro-rated between the parties according to their respective benefits. The total proceeds were $19,074.50 with expenses of $1,609.54 of which 55.62%, or $895.23, shall be borne by the Bank and 44.38%, or $714.31, should be paid by the Debtors.

IT IS, THEREFORE, ORDERED, consistent with this opinion, that the Debtors' Complaint to avoid the Farmers State Bank of Fosston's lien be DISMISSED with auction expenses apportioned as set forth.